# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE CHEMOURS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0351-SG |
| | ) | |
| DOWDUPONT INC., CORTEVA, INC., | ) | |
| AND E.I. DU PONT DE NEMOURS | ) | |
| AND COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 18, 2019
Date Decided: March 30, 2020

Joel Friedlander, Jeffrey Gorris, Christopher Foulds, and Christopher P. Quinn, of FRIEDLANDER & GORRIS P.A., Wilmington, Delaware; OF COUNSEL: William Savitt, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Plaintiff The Chemours Company*.

Robert S. Saunders, Jennifer C. Voss, Arthur R. Bookout, and Jessica R. Kunz, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Defendants DowDuPont Inc., Corteva, Inc., and E.I. du Pont de Nemours and Company*.

GLASSCOCK, *Vice Chancellor*

Shortly after the American Revolution, in 1802, what would become E. I. du Pont de Nemours and Company ("DuPont") began construction of its powder mills on the falls of the Brandywine Creek.[1]  The enterprise took advantage of the happy fact that the potential power of the Brandywine was available just a few city blocks from a deep-water port, in Wilmington.  DuPont grew to be a chemical giant.  To point out that DuPont and the family that founded it dominated Delaware's economic, civic, and cultural life for most of the State's existence is to state a truism.  If an example were needed at this time of the inherent frailty and impermanence of the works of man,[2] then one could look to the serial reorganizations that DuPont found necessary over the past few years.  The origins of this litigation are found in one such, the spin-off from DuPont of its Performance Chemicals unit (the "Spin-Off") as The Chemours Company ("Chemours").

Chemours was created as a wholy-owned subsidiary of DuPont in 2015, then spun off as an independent entity shortly thereafter.  The terms of the Spin-Off were provided by contract, notably a separation agreement (the "Separation Agreement").  Among the assets and liabilities assigned to Chemours in the Separation Agreement were certain historical environmental liabilities, including a duty to indemnify DuPont for any damage it may incur relating to those liabilities.  In this Action,

---

[1] DuPont de Nemours, Inc., Our History, https://www.dupont.com/about/our-history.html.
[2] As I write, Delaware's courthouses are closed to the public due to the COVID-19 virus.

1

Chemours alleges that DuPont vastly and wrongfully underestimated the size of these historic environmental liabilities, and seeks to limit its indemnification obligations to, at most, the amount that it purports DuPont certified as Chemours' maximum pecuniary exposure at the time of the Spin-Off.

This Memorandum Opinion resolves the Defendants' Motion to Dismiss for lack of subject matter jurisdiction. DuPont points to a broad provision in the Separation Agreement referring all disputes arising from the agreement to binding arbitration. The Separation Agreement provides explicitly that arbitrability is a question for the arbitrator. Thus, per DuPont, I am without jurisdiction to hear the matter.

Chemours, for its part, maintains that it did not consent to any terms of the Separation Agreement, and thus the arbitration provisions are unenforceable, contractually; alternatively, it argues that the arbitrability provisions are unconscionable, and thus void. The matter was ably briefed and passionately argued, with each side maintaining strenuously that public policy requires that the matter be decided in its favor. Nonetheless, my decision does not rest on those policy grounds; I find the issues are governed by rather straightforward application of settled law. I find the language of the Separation Agreement referring arbitrability to the arbitrator controlling here. Accordingly, I have no jurisdiction to entertain

2

this matter, and the Defendants' Motion to Dismiss must be granted.  My reasoning is below.

## I. BACKGROUND[3]

*A. The Parties and Relevant Non-parties*

Plaintiff Chemours is a Delaware corporation headquartered in Delaware.[4] Chemours is a manufacturer of performance chemicals with customers in more than 120 countries and nearly 7,000 employees worldwide.[5]  Pursuant to the Spin-Off, Chemours was separated from DuPont's ownership in a transaction whereby Chemours stock was distributed to DuPont stockholders.[6]  Since the Spin-Off Chemours has been an independent, publicly traded company.[7]

Defendant DuPont is a Delaware corporation headquartered in Delaware.[8] DuPont merged with The Dow Chemical Company ("Dow") in 2017.[9]  Before its merger with Dow, DuPont was a publicly traded company that operated businesses including agriculture, electronics and communications, industrial biosciences,

---

[3] The facts, except where otherwise noted, are drawn from the well-pled allegations of The Chemours Company's Verified First Amended Complaint, Docket Item ("D.I.") 33 (the "First Amended Complaint" or "First Am. Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[4] First Am. Compl., ¶ 11.
[5] *Id*.
[6] *Id*.
[7] *Id*.
[8] *Id*. ¶ 12.
[9] *Id*.

nutrition and health, performance materials, and protection solutions segments.[10] DuPont is now a wholly-owned subsidiary of Defendant Corteva, Inc. ("Corteva").[11]

Defendant DuPont de Nemours, Inc. ("DuPont de Nemours") is a Delaware corporation headquartered in Delaware.[12] DuPont de Nemours was formerly known as DowDuPont Inc. ("DowDuPont"), and was formed following DuPont's merger with Dow.[13] Following a series of reorganization transactions in 2019, DuPont de Nemours became an independent company and retained DowDuPont's specialty products business along with the balance of the financial assets and liabilities of historical DuPont not assumed by Corteva.[14]

Defendant Corteva is a Delaware corporation headquartered in Delaware.[15] Pursuant to the reorganization of DowDuPont, DowDuPont distributed all issued and outstanding shares of Corteva common stock to DowDuPont's stockholders by a pro rata dividend.[16] Corteva thereafter became an independent company.[17] Corteva contains DowDuPont's agricultural and nutritional businesses, along with

---

[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 13. Somewhat confusingly, DuPont de Nemours refers to itself currently as "DuPont"— however, the DuPont that is the focus of this Memorandum Opinion is the separate predecessor entitiy E. I. du Pont de Nemours and Company, which also referred to itself as DuPont.
[13] *Id.* DowDuPont is the entity name indicated in the case caption.
[14] *Id.* ¶¶ 13, 72.
[15] *Id.* ¶ 14.
[16] *Id.*
[17] *Id.* ¶ 72.

4

all of the outstanding common stock of the historical entity DuPont exclusive of its subsidiaries.[18]

Non-party Dow Inc. was the third independent entity (along with DuPont de Nemours and Corteva) resulting from the reorganization of DowDuPont.[19] Dow Inc. contains DowDuPont's materials sciences businesses, along with all financial assets and liabilities of historical Dow not related to its agriculture, specialty products, or materials sciences businesses.[20]

*B. Events Leading Up to the Spin-Off*

In 2013, DuPont's management began consideration of restructuring transactions in an initiative entitled "Project Beta."[21] Project Beta focused on DuPont's Performance Chemicals unit, which historically manufactured and sold a variety of industrial and specialty chemicals.[22] The manufacturing processes of these businesses created chemical byproducts and consequently the unit had given rise to many of DuPont's environmental liabilities.[23] Project Beta ultimately became the Spin-Off (of Chemours), which was announced in October of 2013.[24] Chemours

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* ¶ 15.
[22] *Id.* ¶ 16. These chemicals included "titanium dioxide and a range of fluorochemicals and fluoroproducts used as and in refrigerants, lubricants, propellants, solvents, fire extinguishants and electronic gases." *Id.*
[23] *Id.* This included remediation of prior emissions and substantial investment in pollution abatement technology. *Id.*
[24] *Id.* ¶¶ 17, 27.

was incorporated in April 2015 in preparation for the Spin-Off (which was effectuated on July 1, 2015), but even prior to Chemours' incorporation DuPont designated Chemours' prospective management team.[25] Post-incorporation and pre-Spin-Off, Chemours was a wholly-owned subsidiary of DuPont.[26]

The First Amended Complaint alleges that in structuring the Spin-Off, DuPont "made no effort to install procedural protections for Chemours or otherwise replicate an arm's-length bargain."[27] The First Amended Complaint details other alleged procedural defects regarding the Spin-Off transaction:

- Chemours was not permitted to retain independent counsel and DuPont's counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") "unilaterally prepared all of the documents underlying and effectuating the [Spin-Off]"[28]

- DuPont did not permit Chemours' prospective management team to review drafts of the Separation Agreement until approximately fourteen months after the transaction was announced[29]

- When DuPont eventually sent Chemours' general counsel designate a draft of the Separation Agreement, Skadden informed him that, among other things, that Skadden would not provide Chemours legal advice and that Chemours "[would] not be relying on Skadden to advocate for it or to protect its interests" in connection with the Spin-Off[30]

---

[25] *Id.* ¶ 27.
[26] *Id.*
[27] *Id.* ¶ 25.
[28] *Id.* ¶ 26
[29] *Id.* ¶ 27.
[30] *Id.* ¶ 28.

6

- The draft of Separation Agreement sent to Chemours' general counsel-designate did not include schedules listing the assets and liabilities to be allocated to Chemours[31]

The First Amended Complaint alleges that DuPont repeatedly refused to provide Chemours' prospective management team with drafts of liability schedules which left them "unable to evaluate central economic terms" of the proposed Spin-Off.[32] DuPont made clear that Chemours' prospective management "had no reason or right to assess the economic terms" of the Spin-Off and that any discussions between Chemours' representatives and DuPont were not "negotiations" but, rather, "calibration sessions."[33]

In order for the Spin-Off to be consistent with Delaware law, Chemours had to emerge from the Spin-Off "solvent and viable."[34] In the course of structuring the Spin-Off, and ostensibly to fulfil such requirements, DuPont engaged Houlihan Lokey to prepare a financial analysis and opinion concluding that Chemours would be solvent as of the Spin-Off date.[35] To value Chemours' liabilities for this analysis, Houlihan Lokey relied on a "High End (Maximum) Realistic Exposure"—supplied and certified by DuPont—for 87 separate categories of transferred liabilities.[36] These liabilities included, among others, environmental contingent remediation

---

[31] *Id.* ¶ 29.
[32] *Id.*
[33] *Id.* ¶ 30 (internal quotation marks omitted).
[34] *Id.* ¶¶ 47–48.
[35] *Id.* ¶ 49.
[36] *Id.* ¶¶ 50, 52.

liabilities and multiple categories of environmental-related litigation.[37] DuPont certified both the "accuracy of the maximum liability numbers" and that they "represent[ed] DuPont's 'best judgment' of the 'maximum realistic exposure range for each such contingent liability.'"[38] Houlihan Lokey ultimately determined "that it was appropriate, desirable, and in the best interests of DuPont and its stockholders to conduct the [Spin-Off], including the assignment of liabilities to Chemours."[39]

The Spin-Off was ultimately effectuated through a series of agreements and transactions. On May 15, 2015, Chemours (at this point a wholly-owned subsidiary of DuPont) assumed $4 billion in debt and used the proceeds of this debt to authorize a $3.91 billion dividend to DuPont.[40] The Chemours board that authorized the dividend consisted of three DuPont employees who were not expected to join Chemours post-Spin-Off.[41] This same Chemours board held a meeting on June 9, 2015 where they "took notice" that DuPont's board had determined the Spin-Off and the Separation Agreement were in DuPont's best interests, and approved resolutions approving the Spin-Off and the Separation Agreement on Chemours' behalf.[42] Immediately after approving the Spin-Off and Separation Agreement as members of

---

[37] *Id.* ¶¶ 57–58.
[38] *Id.* ¶ 55.
[39] *Id.* ¶ 70 (internal quotation marks and alterations omitted).
[40] *Id.* ¶ 35.
[41] *Id.* These individuals were Nigel Pond (DuPont's M&A Counsel), Michael Heffernan (DuPont's Treasury Manager), and Steven Zelac (DuPont's M&A Manager). *Id.*
[42] *Id.* DuPont's board had authorized the Spin-Off on June 5, 2015. *Id.* ¶ 70.

8

Chemours' board, the three DuPont employees resigned from Chemours' board.[43] One of these individuals, Nigel Pond, was later designated as a Vice President of Chemours, and on June 26, 2015, Mr. Pond executed the Separation Agreement on Chemours' behalf.[44] The Spin-Off was finalized by a stock distribution of Chemours shares to DuPont stockholders on July 1, 2015.[45]

*C. Environmental Damage and Liabilities; Indemnification for Environmental Liabilites*

This litigation primarily concerns a challenge by Chemours of the assignment of certain environmental liabilities to Chemours in the Separation Agreement. Chemours takes issue with the scope of the liabilities assigned to it and what it views as its limited recourse in challenging such assignments.

1. Environmental Liabilities Assigned to Chemours

The First Amended Complaint details a number of environmental liabilities assigned to Chemours in the Separation Agreement. For instance, Chemours was assigned liability for an Ohio multi-district litigation in which 3,500 plaintiffs were seeking damages for cancer and other diseases allegedly caused by exposure to PFOA, a compound used by DuPont historically to manufacture fluoropolymers and fluoroelastomers.[46] This liability had a DuPont-certified "High End (Maximum)

---

[43] *Id.* ¶ 35.
[44] *Id.*
[45] *Id.* ¶ 11.
[46] *Id.* ¶ 82.

Realistic Exposure" of $128 million, including defense costs.[47]   Chemours and

DuPont later agreed to a term sheet which provided that DuPont would settle the

litigation for $670.7 million.[48]   In connection with the PFOA settlement, Chemours

and DuPont amended certain provisions of the Separation Agreement regarding

Chemours indemnification obligations to DuPont specific to PFOA liability.[49]

The Separation Agreement also assigned liabilities to Chemours in connection

with DuPont's Fayetteville Works operation in North Carolina.[50]   Fayetteville Works

discharged perfluoroalkyl and polyfluoroalkyl substances ("PFAS") into the Cape

Fear River—which is a source of drinking water for thousands of people—for at

least thirty years.[51]   DuPont certified $2.09 million as the "High End (Maximum)

Realistic Exposure" liability for Fayetteville Works.[52]   In February 2019, Chemours

entered a consent order with the State of North Carolina to settle claims brought by

the State regarding PFAS-related liability.[53]   The consent order requires the

installation of abatement technology and extensive remediation at a cost to

Chemours of over $200 million.[54]   Chemours still faces civil litigation associated

---

[47] *Id.* ¶ 84.
[48] *Id.* ¶ 90.
[49] *Id.* ¶¶ 91–92.
[50] *Id.* ¶ 93.
[51] *Id.* ¶ 94.
[52] *Id.* ¶ 96.
[53] *Id.* ¶ 99.
[54] *Id.*

with Fayetteville Works, specifically a class action in North Carolina federal court that recently survived a motion to dismiss.[55]

Chemours was additionally assigned environmental liabilities across the State of New Jersey.[56] At the time of the Spin-Off, the certified "High End (Maximum) Realistic Exposure" for New Jersey environmental liabilities was $337 million.[57] In 2018—in connection with the DowDuPont reorganization—DuPont estimated the liabilities at $620 million.[58] The State of New Jersey stated that it was "implausible" that the $620 million estimate could represent "good-faith estimates of [DuPont's historical New Jersey] environmental obligations and liabilities."[59] The State of New Jersey has brought claims against both Chemours and DuPont in connection with the New Jersey environmental liabilities.[60] Additionally, a New Jersey municipality has brought suit against DuPont seeking over $1 billion to address alleged environmental clean-up costs, and New Jersey's Department of Environmental Protection "has issued directives to DuPont and Chemours . . .

---

[55] *Id*. From the First Amended Complaint it appears DuPont is a defendant in this class action along with Chemours. *Id*.

[56] *Id*. ¶ 101.

[57] *Id*. The First Amended Complaint states that "DuPont certified that the 'maximum' Chemours could have to pay for total New Jersey environmental liabilities was $337 million." *Id*. It is unclear from the First Amended Complaint if Chemours purposefully chose not to use the phrase "High End (Maximum) Realistic Exposure" or was simply attempting to vary its word choice. For purposes of this Motion to Dismiss, I assume that the $337 million maximum is of the same kind as the "High End (Maximum) Realistic Exposure" certified by DuPont for other liabilities assigned to Chemours.

[58] *Id*.

[59] *Id*.

[60] *Id*. ¶¶ 101–105.

regarding remediation and clean-up that threaten to impose very substantial additional costs."[61]

DuPont also assigned benzene-related liabilities to Chemours for which DuPont certified a "High End (Maximum) Realistic Exposure" of $17 million, inclusive of defense costs.[62] In 2017, DuPont studied the availability of insurance for benzene liability which valued the potential maximum costs at over $111 million.[63]

Finally, DuPont certified a "High End (Maximum) Realistic Exposure" of $194 million for all other "General Litigation . . . to Perpetuity" which "Houlihan Lokey reflected as including everything not separately valued."[64] In addition to the litigation described above, the First Amended Complaints details separate PFAS litigations brought against DuPont and Chemours by the States of New Hampshire, Ohio, Vermont, and New York.[65] Chemours does not estimate the liabilities associated with these claims but states that it is "clear" they are "not what DuPont certified they were."[66]

---

[61] *Id*. ¶ 106.
[62] *Id*. ¶ 108.
[63] *Id*.
[64] *Id*. ¶ 110.
[65] *Id*. ¶¶ 112–15.
[66] *Id*. ¶ 116.

## 2. Environmental Liability Indemnification Provisions in the Separation Agreement

The Separation Agreement contains indemnification provisions concerning environmental liabilities. Section 6.3 of the Separation Agreement requires Chemours to "indemnify, defend and hold harmless the DuPont Indemnitees from and against any and all Indemnifiable Losses of the DuPont Indemnitees to the extent relating to, arising out of, by reason of or otherwise in connection with (a) the Chemours Liabilities . . . ."[67] The "Chemours Liabilities" includes, among other things, the "Chemours Assumed Environmental Liabilities."[68] The "Chemours Assumed Environmental Liabilities" includes, among other things, a "non-exhaustive list" of environmental liabilities listed on Schedule 1.1(19)(ii)(B).[69] The First Amended Complaint alleges that DuPont "unilateral[ly] allocate[ed]" such liabilities.[70]

According to the Separation Agreement, "[a]ny allocation of liability set forth on Schedule 1.1(19)(ii)(B) shall be deemed to be finally determined in accordance with the allocation reflected on such Schedule and [Chemours and DuPont] agree not to . . . bring any Action[71] challenging any such allocation thereunder or assert

---

[67] First Am. Compl., Ex. A ("Separation Agreement"), § 6.3.
[68] *Id*. § 1.1(34).
[69] *Id*. § 1.1(19)(ii).
[70] First Am. Compl., ¶ 62. The First Amended Complaint also alleges that the indemnification provisions may cover DowDuPont and Corteva in addition to DuPont. *Id*. ¶ 73.
[71] "[A]ny demand, action, claim, suit, countersuit, arbitration, inquiry, subpoena, case, litigation, proceeding or investigation (whether civil, criminal, administrative or investigative) by or before

13

any right to dispute resolution under Article VIII of [the Separation Agreement] with respect thereto."[72] With respect to existing matters of the same type as those listed on Schedule 1.1(19)(ii)(B), but not identified on the Schedule, DuPont is to, "in its reasonable determination," determine whether they shall be listed on the Schedule, consistent with the provisions of the Separation Agreement, a determination which Chemours can challenge via Article VIII's dispute resolution procedures but, "[t]he burden of proof to rebut such determination shall be borne by [Chemours]."[73] Furthermore, "to the extent" that a dispute "arises out of or relates to any Chemours Assumed Environmental Liabilities" all costs borne by the prevailing party shall be paid by the other party, but "only to the extent such liabilities are determined to be 'primarily associated' with Chemours."[74] Thus, the Separation Agreement allocates certain environmental liabilities to Chemours by schedule; Chemours alleges that DuPont has unilaterally allocated such liabilities to Chemours, and that Chemours has limited rights (and faces an unequal cost burden) to challenge such allocation.[75]

---

any court or grand jury, any Governmental Entity or any arbitration or mediation tribunal." Separation Agreement, § 1.1(1).

[72] Id. § 1.1(19)(ii). Article VIII of the Separation Agreement concerns arbitration and is discussed infra, Section I.D.

[73] Separation Agreement, § 1.1(19)(ii).

[74] Id., § 8.2(f). The implications of this provision are that the losing party must pay the prevailing party's costs, but only if there has been a ruling that, pursuant to the Separation Agreement, Chemours should bear such liabilities—i.e. they are "primarily associated" with Chemours.

[75] First Am. Compl., ¶ 62. Chemours also alleges that the Separation Agreement's indemnification scheme "seek[s] to prohibit Chemours from pursuing any indemnity, contribution or other claim-over seeking reimbursement from DuPont for the liabilities being transferred" because "Chemours may not 'make any claim for offset, or commence any action, including any claim of contribution or any indemnification' against DuPont with respect to any of those liabilities." Id. ¶ 46 (quoting

*D. Arbitration Provisions in the Separation Agreement*

In the "event of a controversy, dispute or Action arising out of, in connection with, or in relation to the interpretation, performance, nonperformance, validity or breach" of the Separation Agreement, the Separation Agreement requires DuPont and Chemours to negotiate to settle such Dispute.[76] If the Dispute is not resolved by negotiation during a specified negotiation period, then "such Dispute shall be submitted to final and binding arbitration administered in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA') then in effect (the 'Rules'), except as modified [in the Separation Agreement]."[77] The arbitration is to be conducted by a three-member arbitral tribunal (the "Arbitral Tribunal") and held in New York, New York.[78] With respect to any disputes relating to environmental liabilities, the arbitrators "shall be attorneys with experience in Environmental Laws[79] or technical or scientific experts whose work relates to

---

Separation Agreement, § 6.1(c)). Chemours continues: "[i]n other words, if Chemours has to pay any of the liabilities (either because a regulator or plaintiff pursued it directly or because it had to indemnify DuPont), the Indemnification Provisions seek to preclude Chemours from having any recourse against DuPont." *Id.*

[76] Separation Agreement, § 8.1. The clause reads in full: "In the event of a controversy, dispute or Action arising out of, in connection with, or in relation to the interpretation, performance, nonperformance, validity or breach of this Agreement or the Ancillary Agreements or otherwise arising out of, or in any way related to, this Agreement or the Ancillary Agreements or the transactions contemplated hereby, including any Action based on contract, tort, statute or constitution (collectively, 'Disputes') . . . ." *Id.*

[77] *Id.* § 8.2.

[78] *Id.* §§ 8.2(a)–(b)

[79] "[A]ll Laws relating to pollution or protection of human health or safety or the environment, including Laws relating to the exposure to, or Release, threatened Release or the presence of Hazardous Substances, or otherwise relating to the manufacture, processing, distribution, use,

environmental science, remediation or pollution control issues, as appropriate to the specific disputes."[80] The Separation Agreement and "any dispute arising out of, in connection with or relating to" the Separation Agreement is to be "governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof."[81]

Section 8.2(c) of the Separation Agreement provides that Chemours and DuPont "expressly agree" that "by submitting their dispute to arbitration under the Rules . . . all issues of arbitrability, including all issues concerning the propriety and timeliness of the commencement of the arbitration (including any defense based on a statute of limitation, if applicable), the jurisdiction of the Arbitral Tribunal, and the procedural conditions for arbitration, shall be finally and solely determined by the Arbitral Tribunal."[82] The Arbitral Tribunal "shall have the power to grant any remedy or relief that it deems just and equitable and that is in accordance with the terms of [the Separation] Agreement, including specific performance and temporary or final injunctive relief, provided, however, that the Arbitral Tribunal shall have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any

---

treatment, storage, transport or handling of Hazardous Substances and all Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances, and all laws relating to endangered or threatened species of fish, wildlife and plants and the management or use of natural resources." *Id*. § 1.1(77).
[80] *Id*. § 8.2(a).
[81] *Id*. § 10.16.
[82] *Id*. § 8.2(c).

condition or provision of [the Separation] Agreement . . . nor any right or power to award punitive, exemplary or treble damages."[83] The authority to grant "any pre-arbitral injunction, pre-arbitral attachment, interim or conservatory measure or other order in aid of arbitration proceedings" is granted exclusively to the Arbitral Tribunal or, prior to its constitution, an "Emergency Arbitrator" appointed consistent with the Rules.[84] Section 8.2(g) of the Separation Agreement states that arbitration—under Article VIII of the Separation Agreement—"shall be the sole and exclusive remedy for any Dispute, and any award rendered thereby shall be final and binding upon [Chemours and DuPont] as from the date rendered."[85]

*E. Procedural Posture*

Chemours initiated this Action on May 13, 2019 and filed the First Amended Complaint on August 14, 2019. The First Amended Complaint alleges eleven counts associated with the Spin-Off and the assignment of certain environmental liabilities to Chemours.[86] Chemours alleges that if DuPont had disclosed the "true maximum potential liabilities," assigned to Chemours, Houlihan Lokey "would have arrived at a valuation of Chemours' total liabilities that rendered the $3.91 billion dividend

---

[83] *Id*. § 8.2(e).
[84] *Id*. § 8.2(d).
[85] *Id*. § 8.2(g). As discussed, *supra*, the Separation Agreement was amended on August 17, 2017, in connection with PFOA liability, but no changes were made to the specific provisions discussed herein. First Am. Compl., Ex. C.
[86] At this procedural juncture I need not recount Chemours' allegations in full.

17

unlawful under 8 *Del. C.* §§ 170, 173, 174."[87]  Thus, Chemours seeks a declaration that the Separation Agreement's indemnification provisions are not enforceable or do not apply in excess of the DuPont-certified liability maximums.  In the alternative, Chemours asks to be compensated by DuPont for the environmental liabilities it faces (including indemnification in connection therewith) in excess of the certified maximums.  In essence, Chemours asks for liability capped at DuPont's certified "High End (Maximum) Realistic Exposure" (inclusive of any indemnification obligation of Chemours to DuPont) or that DuPont return "all or a portion of Chemours' $3.91 billion dividend to DuPont, in an amount to be determined at trial."[88]  On August 28, 2019, the Defendants moved to dismiss this Action.[89]  I heard Oral Argument on the Defendants' Motion on December 18, 2019 and considered the matter submitted for decision on that date.

## II. ANALYSIS

The Defendants have moved to dismiss this Action in favor of arbitration under Chancery Court Rule 12(b)(1).[90]  In evaluating the Defendants' Motion, "[t]he

---

[87] First Am. Compl., ¶ 133.

[88] *Id*. at 74.  Additionally, Chemours asks for damages for breach of fiduciary duty in the event of a determination that Chemours "has unlimited responsibility for the true maximum potential liabilities." *Id*. ¶ 194.

[89] Opening Br. in Support of Defs.' Mot. to Dismiss the Verified First Am. Compl., D.I. 40 ("Defs.' Opening Br.").  A Motion to Stay Discovery and Cross Motion to Compel are also outstanding; given my determination in this Memorandum Opinion that I am without jurisdiction, I consider these motions moot.  *See* Defs.' Mot. to Stay Discovery, D.I. 29; Pl.'s Opp'n to Defs.' Mot. to Stay Discovery and Cross-Mot. to Compel, D.I. 34.

[90] Ch. Ct. R. 12(b)(1).

18

court is 'confine[d] . . . to the allegations of the complaint and exhibits thereto, which must be accepted as true for purposes of the motion to dismiss,'" "and 'all inferences therefrom should be construed in the non-moving party's favor.'"[91]  This Court "will dismiss an action under Rule 12(b)(1) 'if it appears from the record that the Court does not have subject matter jurisdiction over the claim.'"[92]  The 12(b)(1) Motion is appropriate at this juncture because "Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[93]

Where parties agree to arbitrate a dispute involving interstate commerce, absent a clear expression in the contract to the contrary, the rules of the Federal Arbitration Act (the "FAA") govern.[94]  Section 2 of the FAA states:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[95]

---

[91] *Orix LF, LP v. Inscap Asset Mgmt., LLC*, 2010 WL 1463404, at *5 (Del. Ch. Apr. 13, 2010) (quoting *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 n.1 (Del. 1999)); *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013) (quoting *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 489 (Del.1982)) (internal alterations omitted).
[92] *Lewis v. AimCo Properties, L.P.*, 2015 WL 557995, at *2 (Del. Ch. Feb. 10, 2015) (quoting *AFSCME Locals 1102 & 320 v. City of Wilmington*, 858 A.2d 962, 965 (Del. Ch. 2004)).
[93] *Gomes v. Karnell*, 2016 WL 7010912, at *3 (Del. Ch. Nov. 30, 2016) (quoting *Legend Nat. Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012)).
[94] *Id.*; *see* 10 *Del. C.* § 5702.  The parties agree that the FAA controls this matter.
[95] 9 U.S.C. § 2.

This provision reflects "both a 'liberal federal policy favoring arbitration,' . . . and the fundamental principle 'that arbitration is a matter of contract[.]'"[96] Courts are to "apply[] general state-law principles of contract interpretation [in] the interpretation of an arbitration agreement within the scope of the [FAA]" and in doing so "must place arbitration agreements on an equal footing with other contracts."[97] Additionally, while "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration . . . if the dispute at issue concerns either contract formation or whether parties have agreed to submit a particular dispute to arbitration, the court must make an initial determination prior to compelling arbitration."[98]

The Defendants contend that Section 8.2(c) of the Separation Agreement mandates dismissal of this Action.[99] That Section reads:

---

[96] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

[97] *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989); *Concepcion*, 563 U.S at 339.

[98] *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 720 (E.D.N.Y. 2017) (quoting *Moses H. Cone*, 460 U.S. at 24–25; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)) (internal alterations and quotation marks omitted). The Third Circuit Court of Appeals recently noted that: "[d]eciding whether arbitration is required is a two-step process: in the first step, the court determines whether 'there is an agreement to arbitrate,' and then in the second step, the court decides whether 'the dispute at issue falls within the scope of that agreement." *Jaludi v. Citigroup*, 933 F.3d 246, 254 (3d Cir. 2019) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009)). The court continued that the first step "is governed by state law" and "[i]n applying state law at step one, we do *not* invoke the presumption of arbitrability." *Id*. at 254–55. Because this Memorandum Opinion deals solely with step one, I apply "ordinary state-law principles that govern the formation of contracts" and do not invoke the presumption of arbitrability. *Id*. at 254 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

[99] Defs.' Opening Br., at 18.

> For the avoidance of doubt, by submitting their dispute to arbitration under the Rules, the Parties expressly agree that all issues of arbitrability, including all issues concerning the propriety and timeliness of the commencement of the arbitration (including any defense based on a statute of limitation, if applicable), the jurisdiction of the Arbitral Tribunal, and the procedural conditions for arbitration, shall be finally and solely determined by the Arbitral Tribunal.[100]

This clause, which delegates resolution of questions of arbitrability—*i.e.* "threshold questions concerning the arbitration agreement"—to the Arbitral Tribunal is known (and referred to by the parties) as a "delegation clause" or a "delegation provision."[101] I adopt this convention and refer to Section 8.2(c) of the Separation Agreement herein as the "Delegation Clause." The United State Supreme Court has held that under the FAA "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."[102] "The question of who decides arbitrability is itself a question of contract. The [FAA] allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."[103] An agreement to arbitrate a gateway issue, such as the arbitration of arbitrability, "is simply an additional,

---

[100] Separation Agreement, § 8.2(c).
[101] *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010); *see* David Horton, *Arbitration About Arbitration*, 70 Stan. L. Rev. 363, 393 (2018); *see also* Defs.' Opening Br., at 21; The Chemours Company's Br. in Opp'n to Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction, D.I. 43 ("Chemours' Answ. Br."), at 50.
[102] *Rent-A-Ctr.*, 561 U.S. at 69.
[103] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).

antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."[104] "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue."[105] Per the Defendants, the Delegation Clause is valid and binding on the parties, meaning that the parties have agreed to "arbitrate arbitrability," and that this Court is consequently deprived of jurisdiction to determine that threshold matter.[106]

### A. Chemours Consented to Arbitration

In the first instance, Chemours urges that it is not bound by the Separation Agreement's arbitration provisions because it did not consent to arbitration. In *Granite Rock Co. v. International Brotherhood of Teamsters*, the United States Supreme Court emphasized the "first principle that underscores all of [its] arbitration decisions: Arbitration is strictly 'a matter of consent.'"[107] "Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their 'powers from the parties' agreement to forgo the legal process and

---

[104] *Rent-A-Ctr.*, 561 U.S. at 70.
[105] *Henry Schein*, 139 S. Ct. at 529. Delaware law is generally consistent with the FAA in this regard. *See James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).
[106] *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).
[107] *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

22

submit their disputes to private dispute resolution.'"[108]  The FAA respects the

primacy of consent and "does not require parties to arbitrate when they have not

agree to do so."[109]  Thus, unless Chemours consented to arbitration, I cannot dismiss

this Action in favor of arbitration.[110]

I must apply state contract law to determine whether Chemours consented to

arbitration.[111]  Section 2 of the FAA mandates that arbitration agreements are to be

enforced as contracts and it *does not* "alter background principles of state contract

law regarding the scope of agreements (including who is bound by them)."[112]  Thus,

"state law . . . is applicable to determine which contracts are binding under [Section]

2 . . . *if* that law arose to govern issues concerning the validity, revocability, and

enforceability of contracts generally."[113]  In considering the agreement to arbitrate,

---

[108] *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)).

[109] *Volt*, 489 U.S. at 478.

[110] I note that I do not consider whether there is "clear and unmistakable" evidence of an agreement to arbitrate—as articulated by *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) and interpreted under Delaware law by *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006)—because Chemours has not argued that the plain language of the Delegation Clause and the Separation Agreement, if applied, do not mandate arbitration.  In fact, the contractual scheme clearly does so.  Chemours instead insists that it did not consent to arbitration in the first place.

[111] *Jaludi v. Citigroup*, 933 F.3d 246, 254 (3d Cir. 2019) (quoting *First Options*, 514 U.S. at 944 ) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

[112] *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) ("The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." (internal citations omitted)).

[113] *Arthur Andersen*, 556 U.S. at 630–31 (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)) (internal alterations omitted).

general state law contract principles, and not any special rules separate to arbitration agreements, must apply.[114] The Separation Agreement—which contains the arbitration provisions in dispute—and any "dispute arising out of, in connection with or relating to" the Separation Agreement is to be "governed by and construed in accordance with the Laws of the State of Delaware."[115] Therefore, I must determine if, under Delaware contract law, Chemours has consented to arbitration.

The Delaware Supreme Court has echoed the Restatement (Second) of Contracts in stating the bedrock principle that "the formation of a contract requires a bargain in which there is a manifestation of *mutual assent* to the exchange and a consideration."[116] In Chemours' view, it did not consent to arbitration as required under the FAA because that foundational requirement of contract formation—mutual assent—is absent.[117] Under Delaware law, "overt manifestation of assent—not subjective intent—controls the formation of a contract."[118] Furthermore, "[w]hether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time

---

[114] *See Perry*, 482 U.S. at 492 n.9.
[115] Separation Agreement, § 10.16.
[116] *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) (quoting Restatement (Second) of Contracts § 17 (1981)) (emphasis added).
[117] Chemours' Answ. Br., at 24–25.
[118] *Eagle Force Holdings*, 187 A.3d at 1229 (quoting *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).

rather than by their after-the-fact professed subjective intent.'"[119] "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound."[120]

Chemours—the party to the Separation Agreement and the entity that the Defendants seek to compel to arbitrate—is a corporation, and "[a] corporation is an artificial being, invisible, intangible, and existing only in contemplation of law."[121] As it is a "purely metaphysical creature, having no mind with which to think, no will with which to determine and no voice with which to speak, [a corporation] must depend upon the faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated."[122] Thus, "[b]ecause it lacks a body and mind, a corporation only can act through human agents."[123]

Chemours concedes that a duly appointed board of directors approved the Spin-Off and the Separation Agreement, and that a duly appointed executive of Chemours, Nigel Pond, Chemours' then-Vice President, executed the Separation Agreement on behalf of Chemours.[124] There is *no dispute* whether Nigel Pond

---

[119] *Black Horse*, 2014 WL 5025926, at *12 (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).
[120] *Eagle Force Holdings*, 187 A.3d at 1230.
[121] *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 59 (Del. Ch. 2015) (quoting *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819)).
[122] *Id*. (quoting *N. Assur. Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924)).
[123] *Id*. at 60.
[124] First Am. Compl., ¶ 35.

25

signed the Separation Agreement in his capacity as Vice President of Chemours.[125]

Delaware law views such a signature as "the most powerful and persuasive evidence" of Chemours' intent to be bound by the Separation Agreement, and, consequently, its consent to arbitration.[126]

Notwithstanding Mr. Pond's signature on the Separation Agreement, Chemours contends that it did not *really* consent to arbitration, because "all the arbitration provisions of the Separation Agreement were conceived, drafted, and executed by DuPont alone."[127]  Chemours alleges that its prospective management team had no opportunity to bargain with DuPont regarding the terms of arbitration nor was it entitled to retain counsel.[128]  Chemours points to a sworn statement by DuPont's former Chief Executive Officer and board chair that states that "DuPont unilaterally determined the terms of the Separation Agreement, including its arbitration provisions, and unilaterally consummated the Separation Agreement without any consent from Chemours."[129]  In essence, Chemours argues that, as a subsidiary, pre-Spin-Off Chemours had no will of its own; it was animated solely by the will of its parent, DuPont, and thus was unable to independently and effectively consent to arbitration.

---

[125] *See* Separation Agreement.
[126] *See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018).
[127] Chemours' Answ. Br., at 25.
[128] *Id*.
[129] Chemours' Answ. Br., Ex. A, ¶ 2.

While Chemours challenges its consent to arbitration in this "real-world" or intuitive sense, it cannot show that it did not consent in the *contractual* sense required by the FAA. Chemours can point to no case that has declined to enforce a parent-subsidiary contract because the subsidiary could not manifest assent due to its domination by the parent.[130] Simply because the parent dictates terms to its wholly-owned subsidiary is *not* a grounds under Delaware law to infer lack of consent such that the contract would not be enforceable. Consent to arbitration under the FAA is contractual consent under state law and, as explained above, I may not

---

[130] Chemours references *Highlands Ins. Grp., Inc. v. Halliburton Co.*, 2001 WL 287485 (Del. Ch. Mar. 21, 2001), *aff'd*, 801 A.2d 10 (Del. 2002), but that case stands for a different concept concerning parent-subsidiary contracts—mutual mistake—which is inapposite here. In *Highlands*, this Court held there could be no mutual mistake in the spin-off agreements at issue in that case "because as a legal matter [the subsidiary] had no independent ability to negotiate the Spinoff agreements" and thus "lacked any ability to change the terms of the Spinoff or to make a 'mistake' about what those terms meant." *Highlands*, 2001 WL 287485, at *8. Under Delaware law, a mutual mistake is "where each [party] labors under a misconception with respect to the same terms of the written instrument sought to be corrected." *Home Life Ins. Co. of Am. v. McCarns*, 16 A.2d 587, 589 (1940). Per the Restatement (Second) of Contracts "[w]here a mistake of of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake. . . . ." Restatement (Second) of Contracts § 152 (1981). As manifestation of mutual assent is an "external or objective standard for interpreting conduct," mutual mistake is a justification for making a contract voidable even though the parties have objectively manifested an intent to be bound. *See id.* § 2 cmt. b (1981) (explaining the external or objective standard). *Highlands* rejected the mutual mistake argument based on the futility of the contention that the respective manifestations of assent made by *each party* were based on a mistake when, as in the parent-subsidiary relationship, it is the *same party* on both sides of the table. However, the fact that there can be no mutual mistake in a parent-subsidiary contract *does not* mean that the legally required manifestation of assent (*i.e.* consent) is absent, but rather simply that the contract is not subject to challenge based on the oxymoronic concept of the same party simultaneously making a mistake separately on behalf of each contracting party.

construe consent uniquely simply because an arbitration agreement is at issue.[131]

Under Delaware contract law, Chemours' board resolution and Mr. Pond's signature on the Separation Agreement evidence Chemours' overt manifestation of assent—and, therefore, Chemours' consent—to the Separation Agreement.[132]

In an effort to escape this conclusion, Chemours contends that the Separation Agreement is not really a contract at all, but a form of quasi-constitutional corporate document. Chemours argues, tautologically, that certain corporate agreements, such as separation agreements, are generally enforceable as contracts "not because they reflect the consented-to agreement that is fundamental to offer and acceptance but because, as a matter of sound administration of the corporate law and public policy, they will generally be enforceable."[133] But accepting Chemours' argument would

---

[131] *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 341 (2011)) ("[Section 2 of the FAA] establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.' The FAA thus preempts any state rule discriminating on its face against arbitration—for example, a 'law prohibit[ing] outright the arbitration of a particular type of claim.' And not only that: The [FAA] also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements." (internal citations omitted)).

[132] Quoting *Weber v. Kirchner*, 2003 WL 23190392 (Del. Ch. Dec. 31, 2003), Chemours argues that Chemours' consent was "coerced," noting that *Weber* "defin[ed] 'coercion' in term of 'overcoming [] free will.'" Chemours' Answ. Br., at 27. However, Chemours leaves out the full quote, which reads: "[t]o prove duress at trial, Weber would have to demonstrate that there was a wrongful act that overcame his free will and that he had no adequate legal remedy to protect his interests." *Weber*, 2003 WL 23190392, at *2. Chemours makes no serious effort to argue that the Separation Agreement is invalid under this rubric, instead focusing on the lack-of-consent argument under the FAA.

[133] Oral Arg. Tr., at 103:15–103:23.

violate the FAA's equal treatment principle because it would permit me to search for a form of consent other than contractual consent, in Chemours' words: "real world" consent.[134] The FAA mandates the application of ordinary state law contract principles, and Delaware law recognizes no subspecies of consent applicable to agreements such as the Separation Agreement. Instead, Delaware law enforces such agreements as contracts, and searches for the requisite contractual manifestation of assent by reference to foundational contractual principles—rendering Mr. Pond's signature near ironclad.[135] A rule that requires an elevated level of consent for purposes of an arbitration agreement where state contract law otherwise recognizes the consent as sufficient would derivate from Delaware law contract principles where an agreement to arbitrate is at issue. Again, the United States Supreme Court has continually held that such a rule violates the FAA.[136] Therefore, Chemours has consented to arbitration under Delaware law.

---

[134] *See* Chemours' Answ. Br., at 27.

[135] Chemours, I note, fails to identify an applicable principle under which provisions of a separation agreement may be classified as contractual or non-contractual.

[136] *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1431 (2019) ("So any state rule treating arbitration agreements worse than other contracts 'stand[s] as an obstacle' to achieving the Act's purposes—and is preempted."); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1616 (2018) (stating that the FAA does not permit "defenses targeting arbitration either by name or by more subtle methods . . . ."); *Concepcion*, 131 S. Ct. at 1742–43 ("Section 2's saving clause permits agreements to be invalidated by generally applicable contract defenses, but not by defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue." (internal quotation marks omitted)); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) ("By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." (internal quotation marks omitted)).

*B. The Delegation Clause is Not Unconscionable*

Chemours contends that, even if a binding contract to arbitrate exists in the Separation Agreement, I must decline to enforce it as unconscionable. Chemours points to purported contractual limitations on the remedies available to the Arbitral Tribunal, unequal cost splitting for challenges to environmental liabilities, and what it alleges are flaws in the bargaining process.

In *Rent-A-Center West, Inc. v. Jackson*, the United Stated Supreme Court held that in determining whether an arbitration agreement is enforceable, only a "challenge[] specifically [to] the validity of the agreement to arbitrate" is relevant, whereas a court may not consider "challenges [to] the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."[137] This holding was grounded in Section 2 of the FAA. That Section "states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' without mention of the validity of the contract in which it is contained," and therefore, the Court held that "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."[138] Arbitration provisions are thus severable from

---

[137] 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)).
[138] *Id*.

the remainder of the contract, "and may therefore be separately enforced and their validity separately determined."[139]

Consequently, an attack on a delegation clause must refer to the unconscionability of that clause and not the broader contractual provisions regarding arbitration.[140] "[U]nder the severability principle, [courts] treat a challenge to the validity of an arbitration agreement (or a delegation clause) separately from a challenge to the validity of the entire contract in which it appears."[141] Therefore, "[u]nless a party specifically challenges the validity of the agreement to arbitrate, both sides may be required to take all their disputes—including disputes about the validity of their broader contract—to arbitration."[142]

The severed Delegation Clause may be invalidated by "generally applicable contract defenses such as . . . unconscionability."[143] Chemours has argued that the Delegation Clause is unconscionable. Under *Rent-A-Center*, I must examine whether Chemours' unconscionability challenge is a challenge to the Delegation Clause itself, or a broader challenge to the Separation Agreement and/or its

---

[139] *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 229 (3d Cir. 2012);
[140] *See MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226–27 (3d Cir. 2018). As discussed, *supra*, the FAA treats a delegation clause as simply an antecedent arbitration agreement and operates on a delegation clause just as it would on any other agreement to arbitrate. *See Rent-A-Ctr.*, 561 U.S. at 70.
[141] *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019).
[142] *Id.*
[143] *Rent-A-Ctr.*, 561 U.S. at 68 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

arbitration provisions (other than the Delegation Clause). Where Chemours has made such a direct challenge, I analyze unconscionability under Delaware law.[144]

Procedural unconscionability "examines the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining," and courts focus on "the relative bargaining strength of the parties and whether the weaker party could make a meaningful choice."[145] Chemours contends that the Separation Agreement's arbitration provisions, including the Delegation Clause, are procedurally unconscionable because they "were written into the Separation Agreement over Chemours' express objection."[146]

Substantive Unconscionability, on the other hand, tests the substance of the exchange: a contract will be deemed substantively unconscionable "if the terms evidence a gross imbalance that 'shocks the conscience'" or if the bargain is on terms "so extreme as to appear unconscionable according to the mores and business practices of the time and place."[147] Procedural and substantive unconscionability are not "separate elements of a two prong test"—instead, the "analysis is unitary,

---

[144] *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989) (noting that courts "apply[] general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [FAA]").
[145] *James v. Nat'l Fin., LLC*, 132 A.3d 799, 815 (Del. Ch. 2016).
[146] Chemours' Answ. Br., at 32 n. 6, 48.
[147] *James*, 132 A.3d at 815 (quoting *Coles v. Trecothick*, 32 Eng. Rep. 592, 597 (Ch. 1804); *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965)).

and it is generally agreed that if more of one is present, then less of the other is required."[148]    Chemours offers the following arguments for substantive unconscionability:

1. "The arbitration provisions of the Separation Agreement would deny Chemours basic rights and remedies available under Delaware law and in the Delaware courts—including the right to raise an unconscionability challenge"[149]

2. "The arbitration provisions reflect an unenforceable imbalance in the parties' rights and obligations" because the parties cannot challenge certain of the Separation Agreement's terms to the Arbitral Tribunal or that Chemours bears the burden to make such a challenge[150]

3. "[T]he arbitration provisions impose one-sided penalties . . . only against Chemours," specifically concerning the costs associated with a challenge to environmental liabilities in arbitration[151]

Number 3 above *is not* a direct challenge to the Delegation Clause.[152]  It argues that Chemours must pay the presumptive costs of a challenge to environmental liabilities.[153]  However, this challenge does not attack propriety of the power of the Arbitral Tribunal to determine arbitrability, instead, it concerns the burden and costs of the substantive challenge of arbitrable claims.  That is, any disparity in cost

---

[148] *Id*. at 815 (internal quotation marks omitted).
[149] Chemours' Answ. Br., at 49.
[150] *Id*. at 51.
[151] *Id*. at 52.  Chemours also protested the limitations on arbitrator selection to environmental experts in certain circumstances, but DuPont has submitted that it "will not object if Chemours appoints an arbitrator without experience in environmental law."  *See Id*. at 56–57; *see also* DuPont's Opening Br., at 40 n.35.  In any event, that provision is not unconscionable.
[152] The relevant provision is Section 8.2(f) of the Separation Agreement, discussed, *supra*, Section I.C.2.
[153] Chemours' Answ. Br., at 57.

allocation to a challenge of liabilities is irrelevant until it is determined whether such claims are arbitrable.[154] Therefore, this is a challenge to the terms of arbitration rather than an attack on the Delegation Clause itself.

Numbers 1 and 2 above can be considered together as a challenge that the Delegation Clause limits the Arbitral Tribunal's ability to grant certain relief and is thus unconscionable. Chemours cites the Separation Agreement's arbitration provisions that deny the arbitrator any "authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision" of the Separation Agreement.[155] Chemours has pled that certain provisions of the Separation Agreement are invalid or unenforceable, and Chemours argues that if the arbitrators determine arbitrability, Chemours must make its arguments regarding the invalidity or unenforceability of the substantive provisions of the Separation Agreement "to the arbitrators—who cannot hear it, because it would involve invalidating, modifying or suspending the arbitration provisions."[156] Thus, because the arbitrators allegedly cannot hear unconscionability challenges to the Separation Agreement, the

---

[154] Namely, the unequal cost shifting in Section 8.2(f) does not apply until there has been a determination by the Arbitral Tribunal that environmental liabilities are "primarily associated" with Chemours—a determination which necessarily cannot take place unless the Arbitral Panel determines that the claims are arbitrable. *See* Separation Agreement, § 8.2(f).

[155] *Id*., § 8.2(e); Chemours' Answ. Br., at 49.

[156] Chemours' Answ., Br., at 50. Chemours also argues that the Arbitral Tribunal is similarly "barred from hearing any 'challeng[e]' to DuPont's allocation of most environmental liabilities." *Id*. at 51. This argument, based on the provisions cited in Section I.C.2., *supra*, similarly concerns the ability of Chemours to challenge certain of the Separation Agreement's provisions before an arbitrator.

Delegation Clause, in Chemours' view, "operates as an unenforceable waiver of unconscionability, and so is in itself unconscionable."[157]

In order to properly challenge the Delegation Clause under United States Supreme Court precedent, Chemours would have to argue that the limitation of the Arbitral Tribunal's powers causes the arbitration *over the arbitrability of Chemours' claims* that the Separation Agreement is invalid or unenforceable to be unconscionable.[158]  Chemours emphatically states that this is so, because the limitations of the Arbitral Tribunal's powers would preclude Chemours' ability to obtain relief.  However, the Arbitral Tribunal must apply Delaware law, just as this Court would, and nowhere does the Separation Agreement prevent Chemours from arguing to the Arbitral Tribunal that the Separation Agreement's arbitration provisions (including those restricting the powers of the Arbitral Tribunal) are inconsistent with Delaware law.[159]  Therefore, Chemours' argument is not really a direct challenge to the Delegation Clause at all; instead, it is a challenge to the Separation Agreement's other arbitration provisions, namely, those concerning the

---

[157] *Id*. at 50.

[158] *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 74 (2010).

[159] The Defendants do not contest that Chemours may make such an argument to the Arbitral Tribunal.  Oral Arg. Tr., at 40:17–41:4 ("THE COURT: My question was simply whether the arbitrator, if – let's assume that Delaware law is such that either the limitations on the remedies before the arbitrator make the claim unarbitrable as a matter of equity, or, conversely, that even if arbitrable, they're not enforceable by the arbitrator because, as a matter of public policy, they can't be enforced.  I assume those same arguments could be made to the arbitrator as made to this Court because the arbitrator, I assume, would be applying Delaware law.  Correct?  [DuPont's Counsel]: Absolutely.")

35

powers of the Arbitral Tribunal and its ability to grant Chemours the relief it seeks. These arbitral terms do not affect Chemours' ability to arbitrate whether the Separation Agreement's arbitration provisions are valid or enforceable. Thus, contrary to Chemours' argument that the Delegation Clause operates as an unenforceable waiver of unsconscionability, the Delegation Clause *does not* waive Chemours' ability to argue unconscionability. What the Delegation Clause does require is for Chemours to make that argument to the Arbitral Panel, not this Court.[160]

Because Chemours does not articulate a substantive unconscionability argument specific to the Delegation Clause, I may not consider these arguments in determining whether the Delegation Clause is unconscionable.[161] Therefore, all that remains is Chemours' procedural unconscionability argument, which mirrors its argument that the arbitration provisions are void for lack of consent.[162]

---

[160] This answers, I believe Chemours' public policy argument that enforcing mandatory arbitration in spin-offs would permit a parent's imposition of unconscionable and illegal provisions beyond, legal review. *See* Chemours' Answ. Br., at 59.

[161] The same result would follow even if Chemours' arguments were considered a direct attack on the Delegation Clause—because the provisions cited do not operate on the Delegation Clause, they cannot render it substantively unconscionable, and consequently any direct attack based on substantive unconscionability would fail.

[162] I consider the procedural unconscionability argument as a direct challenge to the Delegation Clause because Chemours has argued that its lack-of-consent argument "undermines the provisions of the Separation Agreement that purport to delegate the issue of arbitrability to arbitration, mooting DuPont's reliance on the severability of these delegation provisions. Chemours no more consented to delegation than it did to any other feature of the arbitration regime that DuPont unilaterally imposed." Chemours' Answ. Br., at 32 n.6 (internal citation omitted).

Even if the Delegation Clause was the product of procedural unfairness, it cannot be procedurally unconscionable because such a finding cannot be squared with settled Delaware law that "[w]holly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created."[163] To the exent the First Amended Complaint *does* allege sufficient facts to infer procedural unconscionability in a typical commercial setting, that is, one involving separate enterprises each negotiating in its own interest, the spirit of procedural unconscionability—an "examin[ation] [of] the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining"[164]—is wholly inconsistent with the routine enforcement of parent-subsidiary contracts. Such contracts are routinely enforced *not* because they reflect arms'-length bargaining between a parent and its subsidiary—which of course they do not—but because the parent determines they are desirable *for the parent*, and subsidiary fiduciaries "are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."[165] Delaware law enforces these admittedly non-consenual contracts because they allow

---

[163] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007). I note that "[w]hether a contract is unconscionable is determined at the time it was made." *James v. Nat'l Fin., LLC*, 132 A.3d 799, 814 (Del. Ch. 2016) (citing *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 173 (Del. Super. 1986)).

[164] *James*, 132 A.3d at 815.

[165] *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

the corporate machinery to run smoothly—to find such a contract unenforceable based on procedural unconscionability would be nonsensical, because their presumptive validity acknowledges that they are *not* the product of fair bargaining.[166] Therefore, to the extent Chemours has directly challenged the procedural unconscionability of the Delegation Clause, its challenge fails as a matter of law.

Chemours has failed to show that the Delegation Clause is unconscionable under Delaware law. The Delegation Clause properly assigns arbitrability to the Arbitral Tribunal. I may not override the contract, and lack jurisdiction to decide arbitrability.[167] Because this Court lacks subject matter jurisdiction, this Action must be dismissed.

### III. CONCLUSION

The Defendants' Motion to Dismiss is GRANTED. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[166] This Court noted in *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.* that a spun off company offered "no authority for the proposition that, when the parties to a spin-off have continuing contractual relations, those contracts must be negotiated at arms length." 1987 WL 16508, at *4 (Del. Ch. Sept. 8, 1987), *aff'd*, 545 A.2d 1171 (Del. 1988).

[167] *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).